Oral argument is not to exceed 30 minutes per side. Mr. Wilhelm for the appellant. Thank you, your honors. May it please the court. As Mr. Wesson argued in his motion to suppress in state court, his Miranda waiver was not made voluntarily because the police knew that Mr. Wesson was drunk during custodial interrogation and the police exploited his drunken state of mind to obtain his confession. The admission of Mr. Wesson's confession at trial was not a harmless error. His confession was a substantial piece of the state's case used to convict him of these crimes. Mr. Wesson is entitled to habeas relief on his Miranda claim because the Ohio Supreme Court unreasonably determined the facts under section 2254 D2. Your honors, Mr. Miranda, Mr. Wesson's Miranda claim was adjudicated on direct appeal and the Ohio Supreme Court reached the merits. The Ohio Supreme Court identified the pertinent law for Mr. Wesson's Miranda claim. Under clearly established federal law, a Miranda waiver has two distinct dimensions. It must be voluntary, meaning that it's a free and uncoerced choice by the suspect. As well, it must be knowingly and intelligently made, meaning that the suspect understands the right being surrendered and the consequences of the waiver. In assessing the sufficiency of a Miranda waiver, the reviewing court considers the totality of the circumstances under clearly established federal law, which includes all the facts and circumstances surrounding the case, including the characteristics of the suspect and the conduct of the police. Mr. Wilhelm, we're in Edpa land. Do you think of this case as a fact-based claim that the state courts botched the assessment, for example, of whether he was inebriated or not, or is it a law-based case? How do you see it? We have argued below and continue to argue that it's an unreasonable determination of the fact, Your Honor, under D-2. Just to be clear, you think it's just a fact case? Yes, sir. Mr. Wesson did waive his Miranda rights, and the issue comes down to whether it was done so voluntarily. The reason it seems to me to have a flavor of both is you have this threshold question of whether he was inebriated, you have this evidence from the expert, a couple of the officers thought he had alcohol in his breath, but then you have these four officers saying, no, we don't think so. It does seem to me you still have a question. We were able to listen to the interrogation of whether that was voluntary, even if he was not inebriated or even if he was not inebriated in a disabling way. I guess I thought of it as having both components. Yes, Your Honor, but we have presented it as an unreasonable determination of fact, and there are three reasons why the Ohio Supreme Court unreasonably determined the facts. One is it accredited false or unreliable testimony from three officers regarding whether Mr. Wesson smelled of alcohol. That's the first reason. The second reason is it credited what was only marginally relevant testimony from one officer, Parnell, who saw Mr. Wesson at a later date in time. And the third reason is the Ohio Supreme Court on the facts overlooked a course of misconduct or overreaching by the police. For the first reason, Your Honor, the Ohio Supreme Court credited false or incredible testimony from three of the officers. There were the Ohio Supreme Court denied relief on the merits by finding that the trial courts denial of the motion to suppress was based on the credible testimony of four police officers. However, three of their three of those officers testimony was not credible or was indeed even false in two cases. This regards the smell of alcohol on Mr. Wesson. Officer Ingham, who was a patrol officer who participated in the arrest, said that he arrested Mr. Wesson at Reggie Conley's house at about 3.30 a.m. And he testified at the suppression hearing that he did not smell alcohol on Mr. Wesson. Detective Cabellar and Detective Harrah for the Akron Police interrogated Mr. Wesson. Mr. Wilhelm, can I just make sure I'm understanding this? What's your great fact? In other words, I'm not sure I understand why someone who has been drinking, in other words, drinking enough one or two drinks could have alcohol in your breath. I do not consider that a very strong case for involuntariness and coercion when it comes to a Miranda waiver. So don't you have to make a slightly different fact finding that this person was so inebriated, you know, they couldn't knowingly, intelligently, involuntarily waive. And you're talking about whether someone smelled alcohol in someone's breath. That doesn't I find that almost an immaterial point. So what does that say? If I may, the reason why the trial court that the officers gave several reasons for saying that Mr. Wesson was not inebriated when they encountered him at arrest and then for custodial interrogation. And they said that he didn't smell of alcohol and that his gait and hand-eye coordination were fine and things of that nature. It's significant because of the smell of alcohol, because Detective Herod testified falsely at trial that he did not. Or I'm sorry, he testified falsely at the suppression hearing that he did not smell alcohol on Mr. Wesson, but his trial testimony, which was considered under a renewed motion to suppress by defense counsel. That includes the trial testimony. The motion to suppress was renewed at trial. And that included Detective Cabela's testimony that he actually did smell alcohol. That trial testimony also took into account Officer Fox's testimony. He collected a buccal swab for Mr. Wesson at five thirty in the morning and still smelled alcohol at that time. So this wasn't just a case of Mr. Wesson having a faint odor of two drinks. We're talking about a man who was drinking, went to bed at about eleven o'clock at night, as we can piece from the record, was awakened at about three thirty and arrested. And then the officer said an hour later during custodial interrogation, still smelled of alcohol. Counsel, if I might, I think what we're struggling with is even assuming there that he had had alcohol during that custodial interrogation. What is it about that interrogation that would move you into the legal arena of police coercion? Yes, Your Honor. And the Ohio. Thank you for the question. And the Ohio Supreme Court unreasonably overlooked facts of police overreaching. What we have here was a course of conduct by the police. Mr. Wesson. Again, he went to he was had a hard day of drinking. He goes to bed at about eleven o'clock. He's he's arrested at three thirty. A half hour later, the police have proceeded to get into the interrogation room after he's fatigued and groggy from the alcohol. During the custodian, during custodial interrogation, early on in the interrogation, three times, Detective Harrah enforced on Mr. Wesson, you've got to tell us your side. You've got to talk to us. After the third time, Mr. Wesson said, I ain't got nothing to say to you all. And Harrod continued on questioning, saying, well, we found your footprints coming out of the house. Mr. Wilhelm, you know, this is a case where we could listen to the audio. And the idea that the officers were badgering, coercing is fantastical to me from listening to the audio. I thought the conversation was remarkably even keeled and reasonable. The notion that Mr. Wesson was too drunk to waive anything. He said he speaks slowly. That's for sure. That I get. But it's not it's not obvious just from drinking, I must say. I thought everyone accepted he was an alcoholic. Yes, a chronic drinker. What's that? He was an advanced, a chronic, a chronic drinker. And tell me what you mean by saying chronic drinker. What do you what's the qualification included in that phrase? He has a lifelong history of alcohol abuse and was continuing to abuse alcohol as a chronic drinker. Some of the significance of that is, is Dr. Bellotto, the defense toxicologist testified to. Was it a chronic drinker? But before we go there, just you made it sound like the officers were asking unreasonable questions. And I'm just telling you, what am I missing from listening to it? Because that didn't sound unreasonable to me at all. Not that not necessarily that the question was unreasonable, your honor. It's that that's tactic. The police were telling him they've got him up early in the morning. He's still fatigued. He has the smell of alcohol. And he's and they're telling him you've got to talk to us three different times. And then after that, Mr. Wesson says, I ain't got nothing to say to you all. It sounds like a plain invocation of his right to silence. But rather than honoring that scrupulously under the law, the detective Harris said, well, you know what? We found your finger. We found your footprints coming out of the house and continue to interrogate him. And at that point, Mr. Wesson continued to talk. And I suggest that the interrogation, that the audio tape of the custodial interrogation. Although that may not have any high handed particular questions after that, I suggest that Mr. Wesson does sound intoxicated in that his voice is low and raspy. He's sort of slow to respond to things sometimes. And there are many periods in that audio recording when his voice goes into low and audible mumbles. Now, the district court noted in its opinion that Mr. That could just be evidence that Mr. Wesson was tired. However, I would say that Mr. Wesson was concurrently tired and intoxicated when that tape was made. Again, he was he had a hard day of drinking. He goes to bed at 11, roughly. He's awakened at 330 or around that neighborhood and then proceeds to be interrogated about a half an hour later. So it's not just a question of tired. Yes, he is tired, but tired and intoxicated concurrently. Is this. Yes. Go ahead. Go ahead. Let me ask you about the proceedings in the state court on Wesson's intellectual disability. Yes. Status of those. Yes. We have a status conference with the Court of Common Pleas this Thursday. The state is still in the process of selecting an expert to assess Mr. Wesson for intellectual disability. And we have a status conference Thursday. Well, in light of the totality of the circumstances, what role would a finding of intellectual disability have on whether his Miranda waiver was knowing voluntary and intelligently given? Well, your honor, honestly, I don't think it factors in simply because there's no evidence from the record that the police knew of intellectual disability. And at least for in terms of coercing a waiver, rendering a waiver involuntary, the police have to have knowledge of something of low intelligence to take advantage of it. It can't just under Colorado versus Connolly. It can't just be something that's within the process of the defendant's own mind. It has to be something that the police are aware of and take advantage of. And honestly, I don't see any record evidence that the police knew that he could be intellectually disabled, although they were probably aware that he had a fairly low IQ just from dealing with him. Is the interrogation audio tape being used in that separate proceeding? Not that it hasn't been. And there's there's no evidence. There's no. As I said, your honor, we've had just a series of status conferences. We haven't delved into the nitty gritty of what evidence will be considered or the scope of a hearing. And at this point, we're still waiting for the summit county prosecutor's office to select an expert to go in to see Mr. Wesson to get an assessment for them. Your basic theory is they knew he had been drinking. Yes, your honor. That knowledge counts as the coercion because they know he said a impaired state. And then that makes the ultimate waiver involuntary. That's the basic theory. Yes, but not just that they knew of the intoxication. I suggest, again, that the factual pattern early on when the police were telling an intoxicated Mr. Wesson that you've got to talk to us three times and then he goes to his I don't have anything to say to you. And rather than honoring his right to cut off silence under Miranda and Tompkins, the police instead. Harry ignores it and says, well, we've got your fingerprints or your footprints. I'm sorry. Coming out of the house. How do you respond to the state's argument that that revocation? Idea was not raised below and. That's true. It's not it's not the basis for a habeas claim. It's not the basis for relief. What I suggest is it is part of the totality of the circumstance. Yeah, but the state points out that that hurts you because that shows he understood what he could do. I mean, if your theory is he realizes I shouldn't have waived. It's time to revoke. That really undermines the first argument that he didn't know what he was doing. That's what the state's responses to your argument. Right. But it's his he does have a right to silence. And when it's not honored at that point, he sees that it's futile. That's not what we're arguing about. We're arguing about where there was an involuntary waiver, which partly relates to knowing this intelligently doing something. And the state's saying, first of all, you didn't raise this below. But if you want to use it for the totality and the totality, it's a net negative because it shows he understood the situation. It also cuts against the inebriation point. Because it suggests that he's not that impaired, he's actually thinking through maybe I shouldn't be admitting to murder. Well, I think it demonstrates, though, your honor, that the police were undercutting his right, that it was overreaching by the police. But that's the claim you admit is not in front of us. You admit we can't do that. You then say, but I just want you to think about it from a totality perspective of the voluntariness of the waiver. And the state's response on that front is it actually hurts you. Well, yes, but I don't think it I don't think it does. The police were aware of the facts of the interrogation in this course of this is a course of conduct of overreaching that the police were engaged in to undercut the fact that he had diminished capacity for me from alcohol use. Additionally, your honor. The factual unreasonableness from from the Ohio Supreme Court with regard to the smell of alcohol is important because Dr. Bellato testified at trial that. Certain things that the police testified to Mr. Wesson as a chronic drinker would develop a tolerance to which included slurred speech, having a wobbly gait when intoxicated and having poor hand eye coordination. Those are all things that as a chronic drinker, Mr. Wesson would have a tolerance to. But the smell of alcohol is not something that Mr. Wesson would have a tolerance to. That's something that would be apparent to the police officers. So undermining that was it was an important fact in this case. Can I go back to the first question? I'm still my mind is still still scratching my head over it. You say that the only thing you're raising is a fact based challenge and the fact based challenge turns on the mistaken fact findings about knowledge of impairment. And what I'm struggling what I'm struggling with is what exactly does that get you? I mean, is what you want a new assessment by the state courts of the impairment and then a new, fresh Miranda decision, which is the law point? Because I would have thought you would have said they got the facts wrong. And by the way, they got the law wrong, too, because without getting the law wrong, you don't have a successful constitutional claim. And it's a factual application of the totality of the circumstances is what I'm. So perhaps it is a mixed question of them. I see. So you're saying when you say fact, you mean the ultimate Miranda question is ultimately a fact question. I got it. Yes. Yes. Exactly. The totality of the circumstances that I think it's more mixed. But now I understand what you're saying. I got it. All right. Yes. Thank you, Your Honor. The remedy would be a new trial for the admission of his confession that was coerced by the police. That was a product of his alcohol. I thought I read your brief. I thought I read your brief to say that he what you weren't denying that he caused the death here. But there was some impact that the confession has some impact on the type of conviction. Is that right? That it wouldn't have been aggravated murder? Yes. That's one of the aspects to it. Mr. Wesson talked about some sort of fracas that took place in the house. But without the without Mr. Wesson's confession, it's arguable that the state would even have a sufficient case against Mr. Wesson for identity. And here's why. The state relied on the testimony of the surviving victim, Mary Barala. But her testimony was vacillating and confused and unreliable at best. For example, Mrs. Barhala testified at the. She testified at a deposition and that deposition was admitted to trial in lieu of her actual testimony because of her advanced age and her health problems. So they let her deposition in for a testimony. It was cross examined. Of course, she testified at the deposition that. The person she saw in court had a darker complexion than the person she saw at her house that day had bushier hair. And Ms. Barhala also said, referring to Mr. Wesson at the deposition, he don't look like the one that was in the house that day. There's no. Was there any physical evidence that put him at the scene? No, not. I thought there was. What about the footprints? Yeah, there were some. There were footprints leading out, but I don't think that that would be sufficient evidence along with Mr. Wesson's confession in and of itself. I mean, they could. Did they not do blood tests because of the confession? I'm sorry, your honor, which which blood test? Well, there was blood on the floor, presumably some from Weston. And I'm just wondering if maybe they didn't run blood tests for a match because of the confession. No, I don't. I don't recall any blood being found at the scene for Mr. Wesson, although he did have cuts on his hands. That's correct. It was observed with cuts on his hands, but there was I don't recall any testimony being introduced that they found Mr. Wesson's blood in the house. And the state's case hinged substantially on his confession and Ms. Farhola's testimony as to what went on and that he was there. But again, there were severe problems with Ms. Farhola's testimony. She vacillated on the number of times that Mr. Wesson had been to her house before. She said that he was only there once and in their garage only once. She also said another time in her deposition that he was there several times and complained that Mr. Farhola gave him money several times when he came over. And then a third time, Ms. Farhola said that Mr. Wesson had never been to her house. Her testimony also vacillated with regard to Mr. Wesson's girlfriend, who was named Mildred Ford. Early on in the investigation, Ms. Farhola believed that Ms. Ford was an accomplice of Mr. Wesson's and helped him hide the knife that was used to stab. However, the detectives after that reassured her that Mildred Ford was not involved and she was a victim. And then Ms. Farhola said that Wesson's told her that he wanted to get a gun to shoot Ms. Ford and that became a centerpiece of the state's theory. And also, she told the police that she handed a handgun over to the police in her testimony, but an Officer Horak rebutted that. So her testimony is very confused in terms of identifying Mr. Wesson, getting basic facts right of what he looked like and when he was in the house, and an evolving story about Mr. Wesson's girlfriend, Ms. Ford. So in light of that, her testimony was important to the state's case to convict, and this would not be a harmless error. So your honors, in concluding, the police obtained Mr. Wesson's Miranda waiver through misconduct. He was intoxicated. The police knew that he was intoxicated. They engaged on a course of conduct to undermine his right to silence and obtained his waiver involuntarily. Mr. Wesson is entitled to the writ ordering his release unless the state of Ohio grants in a timely new trial. Thank you. We'll hear from Mr. Willie. Thank you. Thank you, your honors. May it please the court. Charles L. Willie arguing on behalf of the warden. Your honors. The question here is whether the Ohio Supreme Court's adjudication and rejection of Mr. Wesson's claim is objectively reasonable. As Mr. Wilhelm indicated, no dispute here that the Ohio Supreme Court applied to appropriate legal framework. Although certainly a mixed question of law and fact, overall, Mr. Wilhelm has focused on the reasonableness of the Ohio Supreme Court's underlying factual findings. The warden's position is pretty straightforward that the factual findings of the Ohio Supreme Court are firmly supported by the record. Mr. Wilhelm notes. He argues some conflicting testimony with respect to whether the officers smelled alcohol on Mr. Wesson's breath. However, the question here is whether his degree of intoxication was sufficient to render his statements involuntary. The officers, these three officers testified that they did not see any indication that he was so impaired that he did not understand his situation. They did not see any indication. Do you think that that would be so the voluntariness prong of the Miranda waiver, the voluntariness part. We have this kind of requirement or the Supreme Court's got the requirement that there has to be some coercion, some external coercion by the police. So do you think that knowledge, knowledge by the police that someone is intoxicated and then some indication that they're taking advantage of it? Would that be enough coercion to meet that to make something involuntary? No, Your Honor. But I'd like to elaborate somewhat on my answer. We would we would submit that there is actually two components to to a valid Miranda waiver. There's a voluntariness component and there's also a knowledge component. And with respect to the voluntariness, it's the totality of the circumstances which must be reviewed. And, of course, those totality in circumstances include what the officers perceive as the ability of the suspect to voluntarily exercise a choice to waive the suspect's rights. In that regard, the mere fact that the police may have had some reason to think that he may have been intoxicated. If they concluded reasonably that even if he had been intoxicated, he was he was sufficiently capable of voluntarily waiving his rights. Then there would certainly be no police misconduct simply because the police did not immediately stop interrogating him because they thought he might have been drinking. And in terms of the and also with respect to the voluntariness, there must be some. I think it's pretty clear there must be some police misconduct involved in assessing whether a waiver was voluntary. Here, there is no evidence. I think it's fair to say there's no evidence of any police coercion or misconduct. Notably, the district court also listened to the recording of the interrogation and the district court reached the conclusion that the district court could not detect any indications of misconduct. Now, Mr. Wilhelm has argued in the guise of misconduct that the interrogators coerced Mr. Wesson to not to continue talking, even though he desired supposedly desired to stop. Actually, the only indication that he points to our statements very early on in the interrogation, which in context are not statements that Mr. Wesson did not desire to talk because he wanted to remain silent. But rather, he didn't think talking would do him any good because he perceived that the investigators would not believe his story. And of course, as you go through the interrogation, indeed, they did not believe his story. But in the context of what he was saying, they were encouraging him. No, go ahead. Tell us your story. Tell us what happened. He was indicating very momentarily. Well, why should I do that? Because you won't believe me anyway. So far from encouraging him to waive his right to be silent, they were really responding to his very statements that he didn't think the police would believe his story. Now, again, that's the idea. I think Mr. Wilhelm acknowledges that this was never presented or argued at the state court, never argued before the Ohio Supreme Court, to the extent that he was attempting to craft an independent basis, an independent constitutional violation or a distinct constitutional violation. In other words, that the police did not honor his revocation of his previous waiver. That is procedurally defaulted, and Mr. Wilhelm concedes that. Mr. Willie, what happens in a case where you have a suspect, serious crime, so it's understandable that you would go get them, including waking them up in the middle of the night? And let's just say hypothetically that it's clear the person is, you know, they're so drunk, they can barely, they can't stand, for example. So they're incoherent, they can't stand. I take it the norm would be to dry them out, right? You have probable cause, so that's not the issue. You bring them in, and you dry them out. So you would wait until they can speak, stand, talk, etc. Then that's out the window. So why wouldn't the conventional approach be, even if you just smell any alcohol, you know, just wait. I mean, there's no downside. You clearly would have this kind of serious crime. I can't imagine a world in which you can't keep custody of the person until they're entirely sober. I mean, wouldn't that be the normal police approach? Your Honor, I would take it that yes, but I think with the qualification, it would be a judgment on the part of the officers with respect to how intoxicated they believe that the suspect was. That would be a judgment on their part. There are countervailing circumstances. Although, yes, a wise choice could be if a suspect is very inebriated or there is a reasonable question as to the suspect's ability, then waiting could be an advisable policy. On the other hand, a countervailing policy would be that if a person is willing to, seemingly willing to talk and to talk to the police, and there is a good faith reason that the person is not incapable of waving, then, of course, the better to have this statement as fast as possible. First of all, I mean, human nature. Persons who are not intoxicated and waive their rights may soon change their mind. So, again, it would be, I think, a reasonable policeman. And finally, there's the factor involved in terms of do you want to take a statement that will be ruled to be inadmissible eventually. Again, I think all good police officers have an eye down the road, not simply the immediate concern, but they have an eye for the prosecution. Mr. Willie, when you listen to this audio tape, you can't deny that he speaks slowly. He's certainly not elaborating. You know, we don't have any visual cues. Do you think this is a low IQ situation? What do you think explains the... I would agree he doesn't necessarily sound drunk. I wouldn't say that. But I would also say he definitely speaks very slowly, reluctant. Reluctance probably not that's loaded. But what do you think's going on? Even if you are not drunk, what is it? I kind of share the same thing that the district court, the impression the district court had that it was a combination of fatigue and perhaps some a combination of fatigue and perhaps his intelligence. I mean, again, I think it is fair to say that these things will come into play. But the ultimate question is whether, nevertheless, the person had the ability to understand his or her rights and voluntarily waive them. I don't think anybody would dispute that there are suspects and then there are suspects. There are persons who are highly intelligent and there are persons that are not highly intelligent. And those certainly the intelligence level is a factor in how a person responds to a particular situation. Do you think the police officers would have been aware of perhaps intellectual incapacity? If the state court then finds that he is intellectually disabled, how would that fit within the argument that it was a voluntary, knowing, intelligent, involuntary statement on the part of Mr. Wesson under the totality? Would you have to consider everything? Yes, Your Honor. I would agree with Mr. Wilhelm there that there's no indication that the officers were aware of Mr. Wesson's intellectual abilities. I mean, at least his level of intellectual functioning. That, of course, is the primary consideration. It is possible that a lay person can, in listening to a person, answer questions. It's possible that a lay person might get a sense of a person's intelligence, how intelligent they are, or perhaps lesser intelligence. But there was no question here that, I mean, the officers did not know, have any information akin to, say, the assessments of teachers or experts or other people as to any limitations on Mr. Wesson's intellectual abilities. Again, if you look at this, if you read the transcript of the interrogation, what jumps out at me is that there was a consistency to what he said. I mean, it was almost that, I don't want to make light of this, but, you know, that's my story and I'm sticking to it. I mean, there was a consistency with his statement that, no, this was self-defense, and these people did attack me, and I know you won't believe me, but that's what happened. And there was a number of instances in which the interrogators expressed doubt and actually gave him openings or encouraged him to, no, wait a second, you really mean that? Come on. Now, how do you explain, look how many times that the person was stabbed. Do you really say that this was self-defense? I mean, look at how many stab wounds there were. And yet he persisted. I mean, yet he said, no, no, no, you don't believe me, but this was self-defense. You know, this, I was protecting myself. When one considers, again, the totality of the circumstances, his situation, the Ohio Supreme Court, it's fair to say, relied on the credibility assessment of the trial judge, which was certainly a reasonable thing to do. All things considered, this statement really comes down to an assessment, perhaps, of the credibility of the officers who did the interrogation. Again, of course, as the court knows, trial judges are historically believed to be in the best position to make those kind of assessments. And also, it's interesting that, as the court noted, to the extent that Mr. Wesson now argues that, wait a second, you know, these things I said could be considered to be an invocation of my rights. That does cut against the idea that he was unable, did not have the capacity or was unable to understand his rights or understand their implication. Again, this is a kind of a separate, there's two distinct legal questions that may be presented by this situation, and the warden's not in any way admitting or conceding that there was an invocation of the rights, a belated invocation, far from it. Do you agree that it wouldn't be harmless error, though? We have not, I will say frankly, that was not, argument was not made by the warden. The warden did not argue that admission of, if it was constitutional error, that admission would be harmless. The warden didn't make that argument. Nevertheless, there is some physical evidence. I believe the Ohio Supreme Court recounted a knife that was found in Mr. Wesson's possession after the crime that had blood on it. The overall, his statements were consistent with what was found at the scene in terms of that he stabbed the victims. His statement that it was self-defense was not consistent, but it was almost a given. The evidence was pretty powerful that he was there and that he stabbed the victims. The question became, of course, his intent, why he did his intent in stabbing the victims. Overall, again, the statements, not full confessions, I mean, not full admissions. I mean, after all, he did maintain that he was acting in self-defense. But again, the admission of the statements, the Supreme Court of Ohio's factual, underlying factual findings, and here I mean, of course, historical, what happened? I mean, what actually happened at the interrogation? And here we are very fortunate that we have a recording. And what they detected has actually happened, how they characterized the interrogation, no coercion, no overtly coercive activity by the police. The giving of the rights, the apparent willingness, at least to honor those rights, but had they been invoked, which they were not. All these circumstances, the Ohio Supreme Court bottom line is their ultimate adjudication firmly supported by the evidence of record. And as a result, there can be no entitlement to habeas corpus relief. If the court, unless the court has further questions, we would ask that the court affirm the judgment of the district court. I think, thank you, Mr. Willey. I think we're set. So thank you very much. And Mr. Wilhelm, get your full rebuttal.  The Ohio Supreme Court did unreasonably determine the facts because it failed to consider the evidence that was developed at trial. Showing that there was false testimony denying that Mr. Wesson smelled of alcohol. That trial testimony was included in a renewed motion to suppress. And that demonstrates that at 530 in the morning, Mr. Wesson still smelled of alcohol and Officer Fox is very definitive about it. But why is it coercion to consider, to continue an interrogation when you smell alcohol? Let's just accept your premise of your argument. I guess I'm just, doesn't seem very obvious to me that that proves coercion. Well, again, we'll look at the entire facts, the totality of the circumstances, Your Honor. Here, the police were, it's significant, the police are in a hurry to get him into the interrogation room. It's been about a half an hour after arrest in the middle of the night, and here's a guy who's reeking of alcohol. And early on in the process, Mr. Wesson tries to, the police are telling him, you've got to talk to us, you've got to tell us your side. And early on in the process, he invokes his right to silence and it's just blown off. It's just completely ignored by the officers. And under those circumstances, I think that shows a pattern to undercut Mr. Wesson's right to silence by playing upon his intoxication. And from the testimony of the toxicologist, Dr. Bellotto, that was offered at the suppression hearing, by the time of the interrogation, he estimated Mr. Wesson's blood alcohol content to be 0.17, which is about double the legal limit in Ohio. And this is not a harmless error. The admission of this confession was a substantial piece of the state's case. And as the Supreme Court has instructed us in the Arizona Fulminante, confessions are unique pieces of evidence that are uniquely strong and probative. And considering all the flaws with Mary Barhollow's testimony, this one had a substantial and injurious effect on the verdict. So unless the court has any other questions, I thank you. Well, we thank both of you. These are always difficult cases for us and for our court, and it's always reassuring to have such good advocates. Both of you have a remarkable amount of experience in this area, so thank you very much for bringing that to bear here. We're grateful for the briefs and for answering our questions. So thank you very much.